Filed 3/2/21; Modified and Certified for Partial Publication 4/1/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re J.S. et al., Persons Coming Under the Juvenile Court Law. | B301715 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>A.T.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP04803AB) |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge. Affirmed.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel for Plaintiff and Respondent.

————————————

## INTRODUCTION

A.T. (Mother) appeals from the juvenile court's jurisdiction findings and disposition orders declaring her 16-year-old daughter J.S. and her 12-year-old son M.S. dependents of the court pursuant to Welfare and Institutions Code[1] section 300 and removing J.S. and M.S. from her custody under section 361, subdivision (c).  Mother contends the evidence was insufficient to support the jurisdiction findings and removal orders.  Mother also contends the juvenile court and the Los Angeles County Department of Children and Family Services (Department) did not comply with the inquiry and notice requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related California law.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and M.S., Sr. (Father) are the parents of J.S. and M.S.  Mother also has an adult daughter A.T. from a prior relationship.

### A. *Previous Department Involvement*

In June 2006, the juvenile court sustained a dependency petition on behalf of J.S. and A.T. finding that Mother had "placed [A.T.] in a detrimental and endangering situation in that [Mother] caused [A.T.] to accompany [Mother] while [Mother] committed the crime of theft."  The juvenile court also found that Mother had "a history of substance abuse and [was] a current user of alcohol, including DUI's which render[ed] [Mother] incapable of providing regular care and supervision for the

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

children."  The juvenile court further found that Mother and Father "have a history of engaging in violent altercations in the presence of [A.T.]."  The juvenile court declared A.T. and J.S. dependents of the court and removed them from their parents' custody.  In April 2008, the juvenile court terminated Mother's family reunification services.  In November 2008, Mother agreed to a "non-court case" for newborn M.S.  In January 2009, the juvenile court granted Mother's section 388 petition and ordered the children returned to Mother.  The court also ordered the Department to provide family maintenance services.  In June 2009, the juvenile court closed the voluntary case for M.S. because "[Mother's] family situation stabilized."  In August 2009, the juvenile court terminated jurisdiction over A.T. and J.S. and released the children to Mother.

On October 31, 2018, the Department received a referral alleging Mother and her boyfriend Robert neglected and emotionally abused M.S.  According to the referral, with M.S. in their vehicle, Mother and Robert stole a mail package from a residence.  The police stopped the vehicle and arrested Mother and Robert.  Although the police did not find drugs or alcohol in the vehicle, there was "a digital scale was found in the front passenger seat where [M.S.] was sitting."  The police charged Mother and Robert with child endangerment (felony) and package theft (felony).  The police released M.S. to Leticia C., the maternal grandmother.  J.S. was living with maternal grandfather Ernest T. and maternal step-grandmother Beatrice T.  According to the Department, Mother "agreed and admitted that the children are better off in the care of her family."  Although the Department found the general neglect allegation to be "substantiated," the Department submitted the

3

referral for "closure" because "the family had made an appropriate plan and the children are safe."

B. *Current Dependency Proceeding*

1. *June 2019 Incident and the Department's Investigation*

On June 13, 2019, the Department received a referral alleging that Mother and M.S. were "homeless and currently residing" in a motel and that Mother and Robert used "crack" cocaine in M.S.'s presence. According to the referral, while visiting the motel room, J.S. "witnessed [M.S.] alone in the motel room in the presence of drug paraphernalia including pipes." According to the referral, "[Robert] was heard yelling at the top of his lungs at [M.S.]. . . . Mother [was] allegedly verbally abusive towards [M.S.]. Mother may have mental health concerns and [she] stated that people are spying on her." At the time of the referral, J.S. continued to live with Ernest and Beatrice.

On June 18, 2019, Leticia told the Department that M.S. had lived with her for about six months while Mother was incarcerated. Upon Mother's release from jail, Leticia returned M.S. to Mother. Leticia reported Mother had told her that M.S. "was misbehaving and having tantrums since his return to [Mother's] care." When speaking with Mother, Leticia heard M.S. yelling in the background that Mother "was using crack." Although Leticia stated Mother was "mentally unhinged," she did not know Mother's diagnosis. Leticia reported that J.S. had "found [M.S.] in the room alone and drug paraphernalia around the room, such as, crack pipes."

The Department and police officers made an unannounced visit to Mother's motel room. After the police asked Mother for identification, Mother became "visibly upset" and stated to M.S.,

4

"[S]ee what you have done.  You see what happens."  Mother told the Department that, after M.S. overheard a conversation in which a man at the motel was "accusing residents of dealing drugs and knocking on doors," M.S. "went outside yelling [that Mother] was dealing drugs."  Mother reported "since they have been homeless [M.S.] has not gone to school."  The social worker observed M.S. to be in good health with no visible marks or bruises.

Mother reported that she felt frustrated because she knew Leticia had made the referral to the Department and that Leticia did not like Robert and caused problems for her and Robert. Mother "denied all allegations of drug use, Robert yelling at [M.S.], and [M.S.] being left alone" in the motel.  Mother stated that "she was not willing to drug test as she has gone through this before."  The social worker "informed [M]other again since the allegations were new we needed a new drug test and it was a red flag she was not willing to submit a drug test."  Mother stated "it should not be a red flag her unwillingness to drug test."

After Mother told the Department she was bipolar, Mother stated she had been prescribed medication for the disorder, but she needed to have the prescription refilled.  Mother reported that M.S. "has been acting out" and that she would take M.S. to see a therapist.  In response to the social worker's inquiry about where Robert was living, Mother responded that she and Robert "were not together."  However, the social worker observed "a tool box and men's boots" and "a men's pair of shorts" in the room. Mother denied domestic violence in any of her relationships. Although Mother told the Department "she did not have a personal telephone," the social worker saw "a cell phone sitting on the bathroom sink counter charging."

After the Department made many attempts to contact Mother through the motel's office, on June 26 when the Department made an unannounced visit to Mother's motel room, Mother reported that the social worker "had just missed [M.S.] acting out." The Department observed that Mother "had a cell phone in her hand" and that Robert was present. During an interview with the Department, Robert reported that he drank alcohol and smoked marijuana previously, but "denied using substances now." When asked if he would drug test, Robert replied he had "drug tested for a past [Department] referral and did not feel he should do so again." Robert stated that, during a 2008 dependency proceeding involving his three-year-old daughter, Robert "was incarcerated and attempted to get his daughter back." However, while his daughter was in the care of a foster parent, his daughter died in a car accident. Mother "reported this is why we have a bad taste in our mouths regarding [the Department]." In response to the Department's request, Mother again declined to drug test.

On July 10, 2019, Mother told the Department that "she [was] a victim of domestic violence and had mental health" issues. Mother reported that there was a domestic violence incident between her and Robert about one year ago. Mother admitted that she argued with Robert "over financial matters." Mother reported that she had scheduled a mental health appointment for M.S., but they "missed it." Mother inquired "about options of opening a non-court case with the Department" and "reported she did not have a problem drug testing, but that she was busy today and could not go today." Mother reported J.S. stopped visiting her and "has been upset with [Mother] for unknown reasons." Mother also reported that she planned to

take M.S. to see a doctor and that M.S. "will start school at a nearby school instead of going to his previous school in El Monte."

M.S. told the Department "[h]e felt safe in [Mother's] care." M.S. stated that Mother and Robert argued and that he did "not know what they argue about." M.S. reported that Mother "disciplined" him by hitting "him with a belt or hanger" and that Mother last hit him during the previous month. M.S. stated, "Mother does not use any drugs, but [M.S.] has seen [Robert] smoking marijuana and/or cigarettes inside the [motel] room's bathroom."

On July 18, the Department interviewed Ernest, Beatrice and J.S. Ernest "suspected [Mother] was using methamphetamine because the signs are evident with [Mother] picking at her skin and her behaviors." Ernest reported Mother and Robert "got into an argument recently, when [Mother] learned that [Robert] had given her car battery away to another woman." Mother "supposedly broke up with [Robert]." After stating "he had concerns with Robert being in the household," Ernest reported "he does not like Robert because 'he is a drug dealer, gang banger, and unemployed.'"

When J.S. entered the room during Ernest's interview, J.S. reported Mother "was not using drugs." J.S. stated that Robert was not good for Mother and that she witnessed Robert conducting "drug deals that started with [m]arijuana and moved to a powdery substance." J.S. reported Mother and Robert were still together. Although Robert was not in the motel room the previous day when she visited M.S., J.S. "saw Robert's belongings and clothing and [Mother] stated Robert would be over later that evening." J.S. did not see "any drugs or pipes" in the motel room

7

during that visit.  J.S. stated that M.S. "seemed happy."

After reporting Mother was "typically paranoid," J.S. recalled an incident when Mother "had broken all cell phones in belief '[c]ops were spying on her.'"  J.S. reported that she saw a "dirty" drug pipe in the bathroom of a different motel room where Mother had stayed about a month ago.  J.S. stated the pipe belonged to Robert because it was on Robert's side of the bathroom sink.  In response to the Department's question whether Robert had "strange behaviors that would indicate he is a drug user," J.S. reported Robert "twitches, steals things, and acts weird."  J.S. added that, although she never saw Mother or Robert using drugs, M.S. saw Robert "using drugs" in Mother's previous motel room.  J.S. stated that M.S. had recently broken Mother's television "because [M.S.] was upset by Robert being in the home."

J.S. stated that she did "not have a close relationship" with Mother.  J.S. reported, "[W]hen she was in [Mother's] care, [Mother] and Robert constantly argued every other day.  J.S. did "not believe this ha[d] changed."  J.S. reported Mother and Robert's "last incident of physical domestic violence occur[ed] 3 months ago."  J.S. told the Department that she last saw Father about a year ago and that she did not know his whereabouts.

Beatrice reported that Mother and Robert had been together for about two years and that "they have a domestic violence history resulting in battery charges."  Beatrice reported, "[Y]ou can look at [Mother and Robert] and tell they are using."  Beatrice reported that she raised J.S. for most of her life, "as agreed with [Mother]."  In 2006, during the prior dependency case when Mother was in jail for approximately one year, J.S. began residing with Ernest and Beatrice.  After Mother's prison

term ended, when J.S. was one year old, Mother stated: "[I]t appeared best to let [J.S.] reside with [Ernest and Beatrice], as [J.S.] knew them to be her parents."

### 2. *Removal Order*

After the juvenile court authorized the removal of J.S. and M.S. from Mother, on July 25, 2019, two social workers attempted to serve Mother with the removal warrant at her motel room. Although they saw Mother through the window curtains, Mother refused to open the door. Mother "appeared angry and hostile" and "was yelling and pointing." After hearing the room's "door slam three times," the social workers observed Robert leaving the motel. The social workers called for police assistance because they believed that Mother "was a flight risk." After three police officers responded, Mother was "resistant and hostile with the officers." Mother "refused to allow [the] police to come into the room." One police officer "engaged [Mother] physically by pulling [Mother] from the room." Mother "fought back with the officer," and Mother "was removed from the room." After a social worker served Mother with the removal warrant, Mother "yelled out the allegations were false and informed the Police officers it was all lies." Although Mother "asked why there was a removal order," Mother "continued to yell" and would not allow the social workers to respond.

Through a telephone call with Ernest, the Department learned that M.S. was with a maternal uncle. Although Ernest refused to reveal the maternal uncle's address, Ernest told the social worker that he would retrieve M.S. from the uncle. While the social worker spoke with Ernest, Mother followed the social worker and yelled at Ernest through the social worker's phone, "[D]o not let them have [M.S.]." "During this time frame, the

9

police had to tell [M]other to back off from engaging with the social worker." When Ernest returned with M.S., M.S. told the social workers that "he was doing fine." The social workers informed Ernest and Beatrice of the court hearing scheduled for July 30. The Department reported that Father's whereabouts remained unknown.

C. *Dependency Petition and Detention Hearings*

On July 29, 2019, the Department filed a petition alleging juvenile court jurisdiction over J.S. and M.S. pursuant to section 300, subdivisions (a), (b)(1), and (j). In counts a-1, b-1, and j-1, the petition alleged, "[Mother] physically abused [M.S.] in that [Mother] struck [M.S.] with belts and hangers. Such physical abuse was excessive and caused [M.S.] unreasonable pain and suffering. [Mother] has a criminal history of . . . convictions for Child Cruelty/Possible Injury/Death and Force/Assault with a Deadly Weapon, not a Firearm/Great Bodily Injury Likely." Count b-2 alleged: "[Mother] placed the children in an endangering and detrimental situation in that on a recent prior occasion [M.S.] was found alone in a motel room, for an extended period of time, without appropriate parental care and supervision." In count b-3, the petition alleged that Mother "established an endangering and detrimental home environment for the children" because "drug paraphernalia including drug pipes were found in a motel room within access of the children," Robert "possessed marijuana and was under the influence of marijuana in the presence of [M.S.]," and Robert "engaged in drug sales in the presence of [J.S.]." The count also alleged that Mother knew about Robert's substance abuse and that Mother failed to protect the children.

10

In count b-4, the petition alleged, "[Mother] has a history of mental and emotional problems including a diagnosis of [bipolar] [d]isorder which renders [Mother] incapable of providing the children with regular care and supervision." Count b-5 alleged: "[Mother] has a history of substance abuse including alcohol which renders [Mother] incapable of providing the children with regular care and supervision. [Mother] has a criminal history of convictions for Driving while Under the Influence of alcohol/.08 Percent and Possession/Control Substance Paraphernalia. [J.S.] is a prior dependent of the Juvenile Court due to [Mother's] substance abuse." The count further alleged, "[Mother's] drug related criminal history endangers the children's physical health and safety, placing the children at risk of suffering serious physical harm, damage and danger."

At the July 30, 2019 detention hearing, after Mother entered a general denial, the juvenile court found Father to be presumed father of J.S. and M.S. Mother's counsel stated, "Mother would like the children returned to her. She understands the low burden of proof today. Based on that low standard of proof, she is submitting on the issue of detention, reluctantly." The juvenile court found a prima facie showing had been made that J.S. and M.S. were persons described by section 300. The juvenile court detained J.S. and M.S. from Mother and placed the children with Ernest and Beatrice under the Department's supervision. The court ordered monitored visitation at Ernest and Beatrice's home and random drug testing for Mother. The juvenile court scheduled the jurisdiction and disposition hearing for September 13, 2019.

D. *Jurisdiction and Disposition Hearings*

    1. *The Department's Reports*

J.S. and M.S. remained in the care of Ernest and Beatrice. The Department observed J.S., a sophomore in high school, to be "reserved, intelligent, and well-informed." Although the Department observed that M.S. was able to engage in age-appropriate discourse for a fifth-grader, Mother reported that M.S. was "in need of mental health services." Mother reported that "she participates in daily visitation" with M.S. and J.S., spending approximately three to five hours with the children each day. Ernest and/or Beatrice monitor the visits. Mother reported that she has a "strong bond" with M.S. and that she is "working on her relationship" with J.S.

In J.S.'s interview with the Department, when asked if she saw Mother hit M.S. with "belts and/or hangers," J.S. responded that she had not, but she was not living "in that home (motel room)." J.S. reported she only saw Mother hit M.S. once on his arm "to redirect him." When asked if Mother endangered their "physical health and safety," J.S. responded: "No, the only risk to [M.S.] is [Robert]. He is the reason for all of this. Before he came around, [Mother] and [M.S.] were fine, and [she] was fine here (at [Ernest and Beatrice's] home)."

J.S. reported that she saw M.S. alone in Mother's motel room. J.S. stated, "It [was] never for more than like 20 minutes" while Mother and J.S. went to the store. J.S. added, "We would just tell [M.S.] to not open the door for anyone. That happened pretty often, to be honest." J.S. reported, "[M]ost of the time [Mother] left [M.S.] alone was at [Robert's] house. That was before they started staying at that motel." J.S. told the Department that she did not think Mother placed M.S. at risk by

12

leaving him alone. However, she again stated that Mother "placed [M.S.] at risk by having [Robert] around him."

Contrary to her earlier statements, J.S. told the Department that "she never saw any drug paraphernalia in the motel room." J.S. reported that she saw drug paraphernalia including pipes laid out on a table at Robert's house and that she and M.S. saw Robert smoking marijuana. J.S. added, "That's why I told [Mother] she couldn't bring [Robert] around me. That's why I haven't seen [Mother] in a while." J.S. stated, "It was easy for me to move out, because of what [Robert] was doing, and because my grandparents were all that I knew growing up." When asked if she ever observed Robert "under the influence of illicit substances, while he was in the presence of [M.S.]," J.S. responded: "That's true, because [Ernest, Beatrice, and she] have gone to pick up [M.S.] from Robert's house. Robert was gone. I don't even think he was only on weed, but that's what we called it. I feel like he was on something stronger than that, because he was completely gone and out of it." J.S. continued, "[S]he [knew] that isn't the only time [Robert] was on that stuff. We have picked up [M.S.] before, and [M.S.] has been pretty upset. He would always say that he didn't like staying with [Mother] because of the way [Robert] was acting. I'm pretty sure [Robert] used that stuff all the time." When asked if Robert engaged in drug sales, J.S. stated: "That's true too. [Mother] knew about that too. [Robert] is shady. That's for sure. . . . [Robert] would have random guys coming in and out of the house. Whenever the guys would come to the house [Robert] would tell her and [M.S.] to go to the back. [J.S. was] pretty sure [Robert] was selling drugs, and [Mother] didn't do anything about that. [J.S.] told [Mother], and [Mother] said [J.S.] was paranoid and overreacting.

13

[Mother] always thinks I'm against her."

When asked if she believed Mother had failed to protect her and M.S. from risks associated with Robert's behavior, J.S. stated: "Yeah, I think [Mother] did fail to protect us. . . . [Mother] should have taken [M.S.] away from that place. She has made a lot of bad decisions with [Robert]. She is staying at that motel because of [Robert]. She isn't protecting [M.S.]. She's relying on [Robert], and that's not safe for [M.S.]." J.S. added, "[Mother] kept allowing [Robert] to be around [M.S.]. Even though she knew what [Robert] was doing. [Mother] isn't a bad mom. . . . [Mother] being with [Robert] is a bad decision. Ever since [Robert] has come into her life, everything has gone downhill really fast. He is affecting [M.S.]. [Robert] is making [Mother] unstable. He is a toxic guy, and he is a risk to [M.S.]."

J.S. stated that Mother's mental and emotional problems did not affect her ability to care for or supervise her children. According to J.S., Mother started using methamphetamine when J.S. was three or four years old. J.S. stated that Mother's methamphetamine use "was on and off until about 3 years ago." J.S. reported that Mother did not attend a treatment program. According to J.S., "[Mother] just stopped using at that time. I guess she just bounced back." Although J.S. stated that she never saw Mother use drugs, Ernest told J.S. that Mother "used to use a lot," and J.S. remembered Mother "getting really skinny."

In M.S.'s interview with the Department, the social worker observed that M.S. was able to discern truthful statements from false ones. M.S. initially reported: "[Mother] has hit [him] like one time. It was a soft one. She hit [M.S.] because [he] was saying bad words. [He] called her a b*tch, and [he] said f*ck you.

14

It was because [he] was mad, and [he] wasn't getting [his] way." When asked if Mother had hit him on multiple occasions, M.S. stated: "No, my mom doesn't hit me." The social worker reported: "At this time . . . [M.S.] disengaged from the conversation. [M.S.] started playing with [his] hands underneath the table. [M.S.] no longer made eye contact with [the social worker]." When asked why "his demeanor changed," M.S. stated, "No, nothing. Everything is fine. My mom didn't do anything. Everything is fine." When the social worker asked M.S. if he was being truthful, M.S. replied that he did not remember. The social worker further reported: "[M.S.] continued to state, '[he] didn't] remember,' even when the question was referring to something [M.S.] would know." The social worker observed that M.S. was "happy and energetic until [Mother] was mentioned." When Mother was mentioned, M.S. "avoided eye contact and reported he did not remember pertinent information associated with the petition allegations."

In her interview with the Department, Mother denied that she hit her children. According to Mother, "[She was] on the lenient side. . . . Anyone that knows [her], knows that [she] would never hit [her] kids. . . . [Her] outbursts have been heard (by neighbors), because [she has] been frustrated with the way [M.S.] has acted a few times. [She] has called the police department, because [she didn't] want to hit [M.S.]. When he acts out, I don't really know how to control him." Mother added: "A police officer told [her] once that is it legal to hit my son. [The police officer] told [her] that so [she] would stop calling them when [M.S.] acted out."

Mother admitted that in June 2019 she spanked M.S. Because she did not want M.S. playing a video game, Mother

15

"went on his friend's list, and [she] started deleting people."
Mother reported: "[M.S.] got really mad when he found out what
[she] was doing. He called [her] a f*king b*tch." Mother stated
that she then "took the game away. [M.S.] started throwing
things, so [she] tried to keep him on the bed." According to
Mother, "There was a lot of yelling exchanged, but [she] was just
trying to get him under control. [M.S.] started yelling that [she]
was hitting him with a belt and hangers. [She] didn't hit [M.S.]
with any of that stuff. [She] only hit him with [her] hands. . . .
[She] hit him with an open hand on the arm." Mother added that
she "rarely hit" her children. Because she "was in a domestic
violence relationship with Father," Mother told the Department
that she knew "how it [felt] to be hit, and [she] would never do
that to my kids." When asked about her prior convictions for
child cruelty and assault with a deadly weapon, Mother
responded: "That's another fabrication and lie." Mother denied
she had "convictions for those charges."[2] Mother "reiterated that
she is not prone to violence, so her children are not at risk of
serious physical harm, damage, or danger."

　　When asked about leaving M.S. alone, Mother stated:
"California State Law has no age that it states it is appropriate to
leave your child at home alone. The times that [she] left [M.S.] at

---

[2]　　According to the Department, Mother had convictions for
driving without a license (2000), driving under the influence of
alcohol (2001, 2010), driving with a suspended license (2003,
2013), and committing vandalism (2010). The Department also
reported Mother had convictions for use of force/assault with a
deadly weapon not a firearm, great bodily harm likely (2005),
grand theft (2006), possession of controlled substance
paraphernalia (2006), and child cruelty (2018).

home alone, he's been fine.  [She has] gone across the street to get groceries . . . .  [She has] gone downstairs to throw away the trash.  Other than that, [she has not] left [her] son alone. . . . Sometimes he is playing video games, and he doesn't want to go across the street with me.  [She has] never left [her] children alone for more than 30 minutes."

When the social worker asked Mother whether drug paraphernalia had ever been present in her residence, Mother stated:  "[D]rug pipes were never found in my motel room.  There was no drug paraphernalia ever found here.  That's another lie and fabrication by the [social] worker before you."  In response to the social worker's inquiry whether Robert "possessed marijuana and was under the influence of marijuana in the presence of the children," Mother replied:  "That never happened.  He was never under the influence of marijuana while the children were around. . . . [Robert] doesn't smoke marijuana.  He just has a history of possession and other things like that."  Mother also denied that Robert used "other illicit substances."

Mother stated that she had a bipolar disorder diagnosis and that she had "the right to address my disorder how [she] want[s] to address it."  According to Mother, she was "working through that privately with [her] therapist and psychiatrist at Kaiser."  Mother told the Department that her mental and emotional problems did not affect her ability to take care of her children.  Mother added that she wanted to take medication for her bipolar disorder, but she "just need[ed] to find the right one for [her]."  Mother "vehemently denied having any history associated with an illicit substances."  Regarding the prior dependency proceeding, Mother stated:  "I should have fought against those allegations back then, because I definitely wasn't

17

dependent on drugs or alcohol.  I am definitely not dependent on those things now either."  The Department concluded that Mother was an "illicit substance abuser."

Father called the Department on August 30, 2019 and scheduled a meeting with the Department for September 10, 2019.  However, Father did not appear for the scheduled meeting.

### 2. *September 2019 Hearing*

At the September 30 jurisdiction and disposition hearing,[3] after Mother and Father failed to appear, the juvenile court denied their counsels' requests for a continuance.  The children's counsel asked the juvenile court to dismiss the counts based on Mother's physical abuse of M.S. (counts a-1, b-1, and j-1) and sustain the remaining counts.  Children's counsel argued:  "The children both want me to let the court know that they want the entire petition dismissed, specifically, [M.S.] wants the court to know that he was lying because he was upset with Mother.  He feels that nothing should be sustained.  But as minors' [Child Abuse Prevention and Treatment Act guardian ad litem], I cannot ask the court to dismiss the remainder of the allegations, b-2 through b-5 allegations.  While my clients are minimizing and recanting, now, in addition [to] other family members, minors' counsel would ask the court to find the statements most credible from the detention report, which prove the b-2 through b-5 allegations by [a] preponderance of evidence.  These are spontaneous statements that are contemporaneous in time.

---

[3]     At the September 13 jurisdiction hearing, the juvenile court continued the hearing to September 25 because it was Father's first appearance.  On September 25, the juvenile court continued the hearing to September 30.

There has not been an opportunity for coaching in the meantime. As the court knows, children do recant statements once there is a case—there's been an opportunity, at this time, point, for coaching and minors' counsel does have concerns about that. . . . I believe that the Department met their burden with respect to [counts] b-2, b-3, b-4 and b-5." The Department requested that the juvenile court sustain all counts in the petition. Regarding counts a-1, b-1, and j-1, the Department argued: "This is based, in large part, on [M.S.'s] own statement[s] in the detention report, which minors' counsel notes are particularly credible, based on the fact they were close to in time to the incident, did not have the possibility of being coached." The Department further argued, "It's clear that this family is dealing with not only mental health issues, but substance abuse, domestic violence and physical abuse issues. I would note that [Mother] seems to have a pattern of anger management issues, including when the police came to assist with the [Department], interviewing the children, Mother ended up having to be forcibly removed."

Mother's counsel asked the juvenile court to dismiss the petition. As to count b-2 based on leaving M.S. "alone in a motel room," Mother's counsel contended, "[Mother] did not leave the motel room for an extended period of time, just for a moment while she ran across the street. I believe there is . . . no current risk to the children." Mother's counsel also argued that there was no drug paraphernalia in the motel room. Mother's counsel further argued that there was no risk of harm to the children from Mother's "history of mental health issues" or "any previous problems that [Mother] had [with] alcohol." Mother's counsel added that Mother "was currently seeing a psychologist and a psychiatrist." Mother's counsel requested: "If the court does

sustain any of the petition, and gets to disposition, Mother is asking for, based on my last conversation with her, she is asking for [home-of-parent], based on the lack of nexus with regard to the substance abuse and dependents of the court under [section] 300."

After dismissing counts a-1, b-1, and j-1, the juvenile court sustained the remaining counts in the petition. The court declared M.S. and J.S. dependents of the court pursuant to section 300 and removed the children from Mother and Father. The court found: "[P]ursuant to [section 361, subdivision (c)], a substantial danger exists if these children were returned home to their physical health safety, protection, physical and emotional wellbeing, and they are hereby removed from [Mother]. The court finds that it would be detrimental to their safety, protection, physical and emotional wellbeing and they are hereby removed [from] her, who was the previous custodial parent." The juvenile court ruled that Mother "needs to do random[ ] drug test[ing], if any are missed or dirty, she is to do a full on drug treatment program with random testing, with after care, 12-step program." The court ordered Mother and Father to enroll in individual counseling and complete parenting classes. The juvenile court also ordered an anger management program for Mother and monitored visitation for Mother and Father.[4]

---

[4]      The juvenile court's minute orders from the jurisdiction/disposition hearing provide: "It is reasonable and necessary to remove the child from the mother . . . and the care, custody, and control of the parent(s)/legal guardian(s) from whom the child is are being removed because there is a substantial danger to the physical health, safety, protection, or physical or emotional well-being . . . of the child and there are no reasonable

20

E. *Father's Possible Indian Ancestry*

In the Indian Child Inquiry Attachment form (Judicial Council Form CWA-010(A)) attached to the petition, the Department stated that M.S. and J.S. had "no known Indian ancestry." The Department's July 26 detention report filed on July 29, 2019 stated that "[t]he Indian Child Welfare Act does not apply." On July 30, 2019, Mother submitted a Parental Notification of Indian Status form (Judicial Council Form ICWA-020) stating she had "no Indian ancestry as far as [she] knew." At the detention hearing on July 30, 2019, Mother told the juvenile court that Father did not have any Native American Indian ancestry. The juvenile court ruled: "So based on your responses, the court finds that the court has no reason to know that the Indian Child Welfare Act applies or that these are Indian children."

On September 13, 2019, Father filed a Parental Notification of Indian Status form (Judicial Council Form ICWA-020) indicating Father "may have Indian ancestry." Father wrote on the form that paternal grandmother Rita G. "has 58 percent Native American." At the hearing on September 13, the juvenile court asked Rita, who was in the courtroom, for her contact information and ordered the Department "to follow up." On September 20, Rita told the Department that she submitted her DNA to ancestry.com to obtain pertinent information associated

---

means by which the child's physical health can be protected, without removing the child from the home and the care, custody, and control of that or those parent(s)/legal guardian(s). . . . [¶] The Department . . . made reasonable efforts to prevent removal but there are not services available to prevent further detention."

with the family's lineage.  Rita stated that "to her surprise, the DNA results indicated that she had approximately 54% Native American lineage/heritage" and that the "DNA test[ ] results did not provide an associated tribe of descent."  After sharing that she was "shocked" by the results, Rita added that "she is nearly 100% certain that none of her relatives/family members have been eligible and/or enrolled in any tribe(s)."

Rita reported that her family was "of Mexican descent" and that her grandparents moved from Mexico to the United States in 1917.  When the Department asked if any relatives might know more about the family's potential Native American ancestry, Rita replied:  "No, I am the only person that took the DNA test.  Well, I took it and my Aunt, Maria G[.], took it.  She was like 68 [percent] Native American, but she doesn't know what tribe either.  She is elderly and she wouldn't be able to tell you anything about [it]."  In response to the Department's request, Rita was unable to provide either a telephone number or other contact information for Maria.  The Department reported that Rita "reiterated that she doubts her family is eligible for tribal enrollment."  In its report to the juvenile court, the Department concluded that it could not "effectuate ICWA-020 Notices to a corresponding tribe, as there are no known tribes associated with [Father] or [M.S.] or [J.S.], at this time."

In response to the juvenile court's question concerning what the Department did "once Father indicated there may be Indian ancestry," the Department responded:  "The Department followed up with [Rita].  The results of that interview are on the [September 25 Last Minute Information].  [Rita] indicates that she did a D.N.A. test and it determined she has ancestry.  It does not provide any information about which tribes.  All of this was

22

news to her. She has no additional information, and without any tribes to notice, we're asking the court [to] dispense with ICWA." The juvenile court ruled: "Based on that [recitation], the court is going to find the court has no reason to know that the Indian Child Welfare Act applies or that these are Indian children, but, as always, if the grandmother does find out additional information, and shares it with us, there may be more for the Department to reach out and investigate."

Mother appealed the juvenile court's September 30 orders.

## DISCUSSION

Mother challenges the sufficiency of the evidence supporting the juvenile court's findings and disposition order.[5]

---

[5] "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, as here, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; accord, *In re D.P.* (2015) 237 Cal.App.4th 911, 917; *In re J.C.* (2014) 233 Cal.App.4th 1, 4; *In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.) Accordingly, because we affirm the juvenile court's jurisdiction findings regarding count b-5 that Mother's substance abuse and related issues placed J.S. and M.S. at substantial risk of harm, we decline to address Mother's challenges to the juvenile court's jurisdiction findings related to counts b-2, b-3, and b-4. Mother has not shown how the resolution of those claims would have "'a single specific legal or practical consequence . . . either within or outside the dependency

As to count b-5 based on Mother's substance abuse, Mother argues: "The evidence was insufficient to prove that [Mother] was incapable of providing the children with regular care and supervision due to abuse substances including alcohol." Mother also contends that the juvenile court and the Department failed to comply with the inquiry and notice requirements of ICWA and related California law.

### A. *Substantial Evidence Supported the Jurisdiction Finding Based on Mother's Substance Abuse*

#### 1. *Applicable Law and Standard of Review*

The purpose of section 300 "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2; see *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599.) "At the first stage of dependency proceedings, the juvenile court determines whether the child is subject to juvenile court jurisdiction; [the Department] has the burden to prove jurisdiction by a preponderance of the evidence." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

We review challenges to the sufficiency of the evidence underlying jurisdiction findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Yolanda L., supra,* 7 Cal.App.5th at p. 992.) "'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable

---

proceedings.'" (*In re Madison S.* (2017) 15 Cal.App.5th 308, 329; accord, *In re J.C.*, at p. 4.)

24

trier of fact could make such findings.'" (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; accord, *In re D.C.,* (2015) 243 Cal.App.4th 41, 52.) "'But substantial evidence "is not synonymous with any evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal."'" (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.) ""'Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence."'" (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420; see *In re Donovan L.* (2016) 244 Cal.App.4th 1075, 1093 [a "juvenile court's conclusion 'supported by little more than speculation' [is] not based on substantial evidence"].)

"'"In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J., supra*, 56 Cal.4th at p. 773; accord, *In re S.R.* (2020) 48 Cal.App.5th 204, 219.)

"The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; accord, *In re D.B.* (2018) 26 Cal.App.5th 320, 328-329; *In re D.C., supra,* 243 Cal.App.4th at p. 52.)

## 2. *Substantial Evidence Supported the Jurisdiction Finding*

Section 300, subdivision (b)(1), provides, in relevant part, that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."  A finding of jurisdiction under section 300, subdivision (b)(1), requires the Department "to demonstrate three elements by a preponderance of the evidence: (1) one or more of the statutorily specified omissions in providing care for the child . . . ; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Joaquin C., supra,* 15 Cal.App.5th at p. 561; see *In re R.T.* (2017) 3 Cal.5th 622, 628.)  "Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation].  The court may consider past events in deciding whether a child currently needs the court's protection.  [Citation.] A parent's "'[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.'" (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383-1384; accord, *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216; *In re S.O.* (2002) 103 Cal.App.4th 453, 461.)

In addition, the Legislature has declared, "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child. Successful participation in a treatment program for substance abuse may be considered in evaluating the home environment." (§ 300.2.)

There was substantial evidence to support the juvenile court's finding that Mother's substance abuse and related issues placed the children at substantial risk of harm. Mother has a history of substance abuse. When the Department received the referral alleging Mother's "crack" use in June 2019, the Department confronted Mother with the accusations of drug use and M.S. being left alone with drug paraphernalia. Despite the Department's warning that her refusal to drug test would be a "red flag" and her knowledge that she was under Department scrutiny, Mother refused the Department's requests to drug test. Mother also supported Robert's refusals to drug test for the Department. After the juvenile court ordered Mother to submit to random drug testing at the detention hearing, Mother still refused to drug test. "[A] missed drug test, without adequate justification, is 'properly considered the equivalent of a positive test result[.]'" (*In re Kadence P.*, supra, 241 Cal.App.4th at p. 1384; accord, *In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1217.) Ernest and Beatrice believed that Mother was using illicit drugs "because the signs [were] evident." They reported that "you can look at [Mother and Robert] and tell they are using." Under these circumstances, it was a reasonable inference that Mother continued to have a substance abuse problem.

Although the juvenile court previously found that Mother had a substance abuse problem, Mother "vehemently" denied any

history with illicit substances. She also falsely denied that she had criminal convictions for child cruelty and assault with a deadly weapon. Despite her children's observations of Robert's often impaired state, Mother also denied that Robert smoked marijuana and that he used any illicit substances. The juvenile court reasonably could have inferred that Mother failed to recognize the risk of harm to her children. (See *In re D.B.* (2020) 48 Cal.App.5th 613, 622 [affirming jurisdiction finding where father lacked insight and "gave no sign he would change his conduct" towards daughter]; *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["'[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision'"].)

Mother's refusal to drug test and the inference of continued substance abuse cannot be viewed in a vacuum. Rather, they must be viewed in the context of her recent conduct. Mother and Robert continued to live together, and they had engaged in dangerous activity in the presence of J.S. and M.S. For example, the Department reported that, in late 2018, with 10-year-old M.S. in the front passenger seat of their vehicle, Mother and Robert stole a package from a residence. Although there were no drugs found in the vehicle, when the police arrested Mother and Robert, there was a digital scale in the front seat with M.S.

J.S. reported that Robert conducted drug deals in his residence while the children were living there. Robert's drug deals started with marijuana and "moved to a powdery substance." When J.S. told Mother what she had seen, Mother responded J.S. was "paranoid and overreacting." Ernest reported that Robert was "a drug dealer." J.S. reported seeing Robert "completely gone and out of it" on drugs. Based on her

28

observations, J.S. believed Robert "used that stuff all the time." J.S. reported Mother "kept allowing [Robert] to be around my brother. Even though she knew what [Robert] was doing." In the motel room, J.S. saw drug paraphernalia. J.S. repeatedly stated that Mother was not "protecting my brother." M.S. had broken Mother's television "because [he] was upset by Robert being in the home."

Mother argues that her children were no longer at risk by the time of the September 30, 2019 jurisdiction hearing. However, there was no indication that Mother took any steps to change her behavior. The juvenile court reasonably could have inferred that Mother's behavior would continue. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133-134 ["[a] parent's past conduct is a good predictor of future behavior"]; see *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["she continued the same denials of any wrong doing. One cannot correct a [drug] problem one fails to acknowledge"].)

Based on the foregoing, substantial evidence supported the conclusion that J.S. and M.S. faced a substantial risk of serious physical harm due to Mother's recurrent substance abuse and Mother's failure to protect J.S. and M.S. from Robert's substance use and drug sales. (See *In re Kadence P., supra*, 241 Cal.App.4th at p. 1384 [affirming jurisdiction finding based on substance abuse where the mother hid her use of methamphetamine and marijuana, avoided drug tests, and diluted samples]; *In re Christopher R., supra*, 225 Cal.App.4th at p. 1218 [affirming jurisdiction finding based on substance abuse where the mother, among other things, initially denied cocaine use, missed a drug test, and failed to enroll in a substance abuse program]; *In re Drake M., supra*, 211 Cal.App.4th at p. 766

[substance abuse may be manifested by, among other things, "recurrent substance-related legal problems" or "continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance"].)

B. *Substantial Evidence Supported the Juvenile Court's Order Removing J.S. and M.S. from Mother's Custody*

"'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child.'" (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065; accord, *In re G.C.* (2020) 48 Cal.App.5th 257, 265; *In re D.C., supra,* 243 Cal.App.4th at pp. 51, 54; see § 361, subd. (c)(1).) The juvenile court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B., supra*, 26 Cal.App.5th at p. 332; accord, *In re N.M.* (2011) 197 Cal.App.4th 159, 170.) "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The

30

parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.'" (*In re N.M.* at pp. 169-170; accord, *In re V.L.* (2020) 54 Cal.App.5th 147, 154; *In re D.B.*, at p. 328.)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012 (*O.B.*); accord, *In re V.L., supra,* 54 Cal.App.5th at p. 155 ["*O.B.* is controlling in dependency cases"].) We review the entire record to determine whether the removal order is supported by substantial evidence. (*In re V.L.*, at p. 155; *In re D.B., supra,* 26 Cal.App.5th at pp. 328-329; see *O.B.*, at p. 1011.)

The same evidence that supported jurisdiction amply supported the removal order. Mother nevertheless argues that at the time of the disposition hearing clear and convincing evidence did not support a finding that Mother "was unable to provide care for the children." However, as stated, the juvenile court could have reasonably inferred that, because Robert continued to live with Mother and Mother continued to use illicit substances, the children could not safely remain in Mother's custody. Based on Mother's false denials of her and Robert's drug use and her prior

31

criminal convictions, including her 2018 conviction for child cruelty, the juvenile court also reasonably could have inferred Mother had not gained insight into the substantial risk of harm her behavior posed to her children. (See *In re Drake M.*, *supra*, 211 Cal.App.4th at p. 766 ["[t]he trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case"].)

Mother's argument that "substantial evidence did not support a finding that the Department made 'reasonable efforts' to prevent the removal of [J.S.] and [M.S.] from [Mother's] home and that there were no 'reasonable means' to protect them other than removal" is unpersuasive. As stated, given Mother's failures to drug test, denials of drug use by her and Robert, combativeness with the police and the Department, and failure to appear at the disposition hearing, the juvenile court reasonably concluded that there were no reasonable means to protect the children other than their removal from Mother and that the Department made efforts to attempt to eliminate the need for removal. There was no indication in the record that Mother's behavior had changed or that the children would be safe in Mother's custody. Far from taking steps to change her behavior, Mother refused to acknowledge that there was any risk of harm to her children. Under these circumstances, the juvenile court did not err in removing J.S. and M.S. from Mother's custody.[6]

---

[6] Mother's reliance on *In re Ashly F.* (2014) 225 Cal.App.4th 803 (*Ashly F.*) is misplaced. In *In re Ashly F.*, the Department removed the children from their home based on allegations that the mother physically abused the children and that the father failed to protect them from the mother's abuse. (*Id*. at pp. 806-

There was substantial evidence from which a reasonable trier of fact could have found it highly probable there was a substantial risk of physical harm to J.S. and M.S. if they were returned home to Mother, there were no reasonable alternatives

807.) The mother and father cooperated with the Department. The mother removed herself from the family home following the detention hearing, and the father "had already completed a parenting class." (*Id*. at p. 810.) In its jurisdiction and disposition report, the Department did not describe what "reasonable means" for protecting the children were considered, or what "reasonable efforts" it had made to prevent the children's removal from their home. (*Id*. at p. 808.) The Department's report also did not reveal whether the Department had assessed the father's home and did not contain evidence supporting its conclusions. (*Ibid*.) At the jurisdiction and disposition hearing, when ordering the children's removal from the custody of both parents, the juvenile court did not state any facts supporting its findings, nor did it consider whether the mother's removal from the home was a reasonable means of protecting the children. (*Ibid*.) Concerned that these section 361 requirements "can become merely a hollow formula designed to achieve the result the [Department] seeks," the court in *In re Ashly F.* reversed the disposition order because the evidence did not support the juvenile court's findings that the Department had made "reasonable efforts" to prevent the children's removal or that there were no "reasonable means" to protect the children other than removal. (*Id*. at p. 805.) The court explained that "[a]mple evidence existed of 'reasonable means' to protect [the children] in their home." (*Id*. at p. 810.) The court held that the juvenile court should have considered whether the mother's removal from the home was a "reasonable means" of protecting the children. (*Ibid*.) Here, Mother failed to cooperate and denied that her conduct created a risk of harm for her children.

to removal, and the Department expended reasonable efforts to eliminate the need for removal.  (*O.B.*, *supra*, 9 Cal.5th at p. 1011; see *In re I.J.*, *supra*, 56 Cal.4th at p. 773 ["'[w]e do not reweigh the evidence'"]; *In re S.R., supra,* 48 Cal.App.5th at p.  219 [same].)

The juvenile court's failure to make factual findings on the record to support removal was error, but we conclude it was harmless.  (§ 361, subd. (e) ["[t]he court shall state the facts on which the decision to remove the minor is based"].)  The boilerplate findings in the minute orders are not a sufficient substitute for the juvenile court making factual findings on the record tailored to the case.  But the failure of the juvenile court to state its factual findings was harmless because it is not reasonably probable that, had the court expressly made findings under section 361, subdivision (e), the findings would have been in favor of continued parental custody.  (See *In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1137 ["[a]lthough the court did not state a factual basis for its removal order, any error is harmless because it is not reasonably probable such findings, if made, would have been in favor of continued parental custody"], disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218 ["cases involving a court's obligation to make findings regarding a minor's change of custody or commitment have held the failure to do so will be deemed harmless where 'it is not reasonably probable such finding, if made, would have been in favor of continued parental custody'"]; see Cal. Const., art. VI, § 13 ["[n]o judgment shall be set aside . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court

shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].)

C. *Substantial Evidence Supported the Juvenile Court's ICWA Finding as to Father*

Mother argues: "The court and the Department failed to make ICWA-compliant inquiry and failed to provide ICWA-compliant notice to the Secretary of the Interior and the Bureau of Indian Affairs ("BIA") as required when the identity of the claimed tribe(s) is unknown. As a result, the court's findings that the ICWA did not apply to [J.S.] and [M.S.'s] cases were not valid findings." The Department argues, "[T]he juvenile court had no reason to know [J.S.] and [M.S.] were Indian children as defined by the ICWA, and the notice provision was not triggered." The Department further argues: "The duty of further inquiry under the ICWA also was not triggered."

1. *Applicable Law*

a. *ICWA inquiry requirements*

"ICWA established minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048.) Under ICWA and the California law implementing it, "'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see § 224.1, subd. (a) [adopting the federal definition]; *In re D.S.*, at p. 1048 ["[a]n 'Indian child' is defined in the same manner [under California law] as under federal law"].)

35

"ICWA itself does not impose a duty on courts or child welfare agencies to inquire as to whether a child in a dependency proceeding is an Indian child.  [Citation.]  Federal regulations implementing ICWA, however, require that state courts 'ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child.'  [Citation.]  The court must also 'instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.'"  (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882-883; see 25 C.F.R. § 23.107(a).)

In addition, "ICWA provides that states may provide 'a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under' ICWA.  (25 U.S.C. § 1921.)  Under California law, the court and county child welfare department 'have an affirmative and continuing duty to inquire whether a child,' who is the subject of a juvenile dependency petition, 'is or may be an Indian child.' (§ 224.2, subd. (a); see [citation]; Cal. Rules of Court, rule 5.481(a).)  The child welfare department's initial duty of inquiry includes 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.'  (§ 224.2, subd. (b)).'"  (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 883; accord, *In re T.G.* (2020) 58 Cal.App.5th 275; *In re D.F.* (2020) 55 Cal.App.5th 558, 566; *In re D.S., supra,* 46 Cal.App.5th at p. 1049.)

"California law also requires 'further inquiry regarding the

possible Indian status of the child' when 'the court, social worker, or probation officer has reason to believe that an Indian child is involved [or, under Cal. Rules of Court, rule 5.481(a)(4), "may be involved"] in a proceeding. . . . ' (§ 224.2, subd. (e).)" (*In re Austin J., supra*, 47 Cal.App.5th at p. 883.) Former section 224.2, subdivision (e), which is applicable to this appeal, did not define "reason to believe." (*In re Austin J.*, at p. 883 [the "Legislature, which added the 'reason to believe' threshold for making a further inquiry in 2018, [had] not define[d] the phrase"].)[7] "When that ['reason to believe'] threshold is reached, the requisite

---

[7] The Legislature, however, has since amended section 224.2, subdivision (e), effective September 18, 2020, to provide a definition. (Assem. Bill No. 2944 (2019-2020 Reg. Sess.); Stats. 2020, ch. 104, § 15.) As amended, the statute now provides: "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know [that a child is an Indian child] enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)." (§ 224.2, subd.(e)(1).) Effective January 1, 2020, California Rules of Court, rule 5.481(a)(4), now provides: "If the social worker . . . or petitioner knows or has reason to know *or believe* that an Indian child is or may be involved, that person or entity must make further inquiry as soon as practicable . . . ." (Italics added.) Notwithstanding these amendments, we refer in our opinion to former section 242, subdivision (e), and California Rules of Court, rule 5.481(a)(4) as they read in 2019 when the jurisdiction/disposition hearing took place.

'further inquiry' 'includes: (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs and State Department of Social Services; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe.'" (*Ibid.*; see § 224.2, subd. (e)(2)(A)-(C); former § 224.2, subd. (e)(1)-(3).) "Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under" ICWA and "shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2)(C); see former § 224.2, subd. (e)(3)). Notably, "[t]he sharing of information with tribes at this inquiry stage is distinct from formal ICWA notice, which requires a 'reason to know'—rather than a 'reason to believe'—that the child is an Indian child." (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1049.)

b. *ICWA notice requirements*

"In addition to the inquiry that is required in every dependency case from the outset and the 'further inquiry' required under California law when there is a 'reason to believe' an Indian child is [or may be] involved, a third step—notice to Indian tribes—is required under ICWA and California law if and when 'the court knows or has reason to know that an Indian child is involved.'" (*In re Austin J.*, *supra*, 47 Cal.App.5th at pp. 883-884; see 25 U.S.C. § 1912(a); § 224.3, subd. (a); Cal. Rules of Court, rule 5.481(b)(1); see also *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1050 ["If the inquiry establishes a reason to know an Indian child is involved, notice must be provided to the pertinent

38

tribes."].)

A "'reason to know' exists under any of the following circumstances: '(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child[;] [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child who is the subject of the proceeding gives the court reason to know [he or she] is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[;] and [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe.' (§ 224.2, subd. (d).)" (*In re D.S.*, *supra*, 46 Cal.App.5th at pp. 1049-1050.)

Notice to a tribe "must include enough information for the tribe to 'conduct a meaningful review of its records to determine the child's eligibility for membership.'" (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1050; see *In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576 ["[t]he purpose of the ICWA notice provisions is to enable the tribe or the [Bureau of Indian Affairs] to investigate and determine whether the child is in fact an Indian child"].) This includes providing "identifying information for the child's biological parents, grandparents, and great-grandparents, to the extent known." (*In re D.S.*, at p. 1050; see § 224.3, subd. (a)(5)(C).) "A determination by an Indian tribe that

39

a child is or is not a member of, or eligible for membership in, that tribe . . . shall be conclusive."  (§ 224.2, subd. (h).)

To summarize:  An initial "duty of inquiry applies to every 'child for whom a petition under Section 300, 601, or 602 may be or has been filed' (§ 224.2, subd. (a))," the "duty of further inquiry applies when there is a 'reason to believe that an Indian child is involved [or, under Cal. Rules of Court, rule 5.481(a)(4), "may be involved"] in a proceeding' (§ 224.2, subd. (e))," and "the duty to provide notice to Indian tribes applies only when one knows or has a 'reason to know . . . an Indian child is involved.'"  (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 884; see *In re M.W.* (2020) 49 Cal.App.5th 1034, 1047 ["a 'reason to believe' the minor is an Indian child triggers requirements less rigorous than does a 'reason to know'"].)

### 2.  *Standard of Review*

Where, as here, the juvenile court finds ICWA does not apply to a child, "[t]he finding implies that . . . social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry."  (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 885; see *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1050 ["[t]he juvenile court may . . . make a finding that ICWA does *not* apply because the Agency's further inquiry and due diligence was 'proper and adequate' but no 'reason to know' whether the child is an Indian child was discovered"].)  "We review a court's ICWA findings for substantial evidence.  [Citations.]  'We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance.'"  (*In re Austin J.*, at p. 885.)  The appellant "'has the burden to show that the evidence was not sufficient to

support the findings and orders.'" (*Ibid.*)

   3. *Substantial Evidence Supported the Juvenile Court's ICWA Finding*

In his ICWA-020 Form, Father indicated he "may have" Indian ancestry. He wrote Rita "has 58 percent Native American." When the Department spoke with Rita "to discuss the paternal relatives Native American ancestry," she was "nearly 100% certain that none of relatives/family have been eligible and/or enrolled in any tribe(s)." However, she received test results from ancestry.com that indicated "she had approximately 54% Native American lineage/heritage." She had no other pertinent information to provide the Department. Rita did not have contact information for paternal Aunt Maria, who also received similar results from ancestry.com. Father's only source of information regarding his "Native American" ancestry was Rita.

While indigenous people in the United States are often referred to as "Native Americans," the term "Native American" has a different connotation for purposes of ancestry.com. According to its website, the "Native American Ethnicity" group includes "ethnic origins" from North America and South America, "[s]tretching from Alaska to the tip of Argentina."[8] Under these circumstances, because Rita's ancestry.com results did not contain the identity of a possible tribe or any specific geographic region from where her ancestry may have originated, the ancestry.com results, even if a reliable source of possible Indian

---

[8]   https://www.ancestry.com/dna/ethnicity/native-america (last visited Feb. 22, 2021).

41

ancestry, suggested "Native American" ancestry over a vast geographic area. As such, the information had little usefulness in determining whether J.S. and M.S. were Indian children as defined under ICWA.

As stated, under ICWA, an "Indian child" is a member of a federally recognized Indian tribe, or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. (25 U.S.C. § 1904(4), (8).) "Being an "Indian child' is thus not necessarily determined by the child's race, ancestry, or 'blood quantum,' but depends rather 'on the child's political affiliation with a federally recognized Indian Tribe.'" (*In re Austin J., supra,* 47 Cal.App.5th at p. 882; see *In re T.G.* (2020) 58 Cal.App.5th 275, 294 ("an 'Indian child' is defined in terms of tribal membership, not ancestry"].) Without the identity of a tribe, let alone a federally recognized one, or at least a specific geographic area of possible ancestry origin, the Bureau of Indian Affairs (BIA) could not have assisted the Department in identifying the tribal agent for any relevant federally-recognized tribes. (§ 224.2, subd. (e)(2)(B); see former § 224.2, subd. (e)(2) ["[f]urther inquiry" includes "[c]ontacting the [BIA] . . . for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership in"]; *In re M.W., supra*, 49 Cal.App.5th at p. 1042 ["[w]ith that limited information [of specific tribes and geographic regions] . . . the Department contacted the [California Department of Social Services] and the BIA to obtain assistance in identifying the designated tribal agents for all federally-recognized Navajo, Apache, and Cherokee tribes"].) Transmission of a notice to the BIA would have been an idle act. (Civ. Code § 3532 ["[t]he law neither does nor requires idle

42

acts"].)  Without more information, the Department also could not send notices to any tribes.[9]

To the extent that Rita's information constituted "reason to believe that an Indian child is [or may be] involved," the Department conducted an adequate and proper investigation under section 224.2, subdivision (e).  Father's information came from Rita.  Rita told the Department that her family came to the United States in 1917 and that she does not know of any tribe associated with her family.  Rita had no other information, and there were no other paternal relatives identified.  To the extent required, the Department conducted an adequate and proper further inquiry under section 224.2, subdivision (e).  (See *In re D.F., supra,* 55 Cal.App.5th at p. 570 ["Based on the record before us, we find [the Department] made a good faith effort to gather information about the children's membership status or eligibility. [The Department's] inquiry obligation is 'not an absolute duty to ascertain or refute Native American ancestry'"]; *In re D.S., supra,* 46 Cal.App.5th at p. 1054 ["the Agency followed the proper procedures in conducting its further inquiry, but the limited information provided by Aunt was too attenuated for the Agency to do anything further"]; see also *In re A.M.* (2020) 47 Cal.App.5th 303, 323 ["ICWA does not obligate the court or [the Department] 'to cast about' for investigative leads"].)

---

[9]     Mother's reliance on title 25 of the United States Code section 1912(a) is misplaced because that section requires notice to the BIA when "the court knows or has reason to know that an Indian child is involved."  Here, that threshold has not been crossed.

43

Substantial evidence supported the juvenile court's findings that there was "no reason to know" that M.S. and J.S. were Indian children and that ICWA did not apply.  (*In re D.F., supra,* 55 Cal.App.5th at pp. 571-572 ["[The Department's] further inquiry did not result in a *reason to know* the children are Indian children.  We conclude the court's finding that ICWA does not apply to the children is supported by substantial evidence"]; *In re  M.W., supra,* 49 Cal.App.5th at p. 1048 ["[t]he Department satisfied the criteria set forth in section 224.2, subdivision (e) and the juvenile court's finding that, based on the evidence provided, there was no reason to know the minor was an Indian child and no further noticing was required, and its determination that the ICWA did not apply were supported by substantial evidence"].)

## DISPOSITION

The juvenile court's September 30, 2019 jurisdiction findings and disposition orders are affirmed.


DILLON, J.*


We concur:


SEGAL, Acting P. J.          FEUER, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

44

Filed 4/1/21

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re J.S. et al., Persons Coming Under the Juvenile Court Law. | B301715 |
| | (Los Angeles County Super. Ct. No. 19CCJP04803AB) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. A.T., Defendant and Appellant. | **ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PARTIAL PUBLICATION [NO CHANGE IN APPELLATE JUDGMENT]** |

THE COURT:

   The opinion in this case filed March 2, 2021 is modified as follows:

---

\* Pursuant to California Rules of Court, rules 8.1105(c) and 8.1110, this opinion is certified for publication with the exception of parts A, B, C, and D of the Factual and Procedural Background, the first paragraph of the Discussion section before part A, and parts A and B of the Discussion.

1

1. On page 2, in the Introduction section, delete the last sentence, which reads "We affirm," and replace with:

> In the published portion of this opinion, we hold the Department conducted an appropriate further inquiry, as required by section 224.2, subdivision (e), and California Rules of Court, rule 5.481(a)(4), into the children's possible status as Indian children, including with respect to the paternal relatives' ancestry.com results showing "Native American" ethnic origin. In the unpublished portion, we conclude substantial evidence supported the jurisdiction findings and removal orders. Therefore, we affirm.

2. On page 2, in the second sentence of the first paragraph of the Factual and Procedural Background, before part A, delete "A.T." after the word "daughter," so that the sentence reads:

> Mother also has an adult daughter from a prior relationship.

3. On page 21, in the first sentence of the first paragraph of part E, replace "Form CWA-010(A)" with "Form ICWA-010(A)".

4. On page 21, in the second paragraph of part E, in the third full sentence, add the phrase "jurisdiction/disposition" before the word "hearing," so that the sentence reads:

> At the jurisdiction/disposition hearing on September 13, the juvenile court asked Rita, who was in the courtroom, for her contact information and ordered the Department "to follow up."

5. On page 22, in the first sentence of the last paragraph beginning "In response to," add the phrase "At the continued jurisdiction/disposition hearing on September 30,

2019," to the beginning of the sentence, so that the sentence reads:

> At the continued jurisdiction/disposition hearing on September 30, 2019, in response to the juvenile court's question concerning what the Department did "once Father indicated there may be Indian ancestry," the Department responded: "The Department followed up with [Rita].

6. On page 41, in the penultimate sentence of the first paragraph under subheading 3, replace the word "Aunt" with "aunt," so that the sentence reads:

> Rita did not have contact information for paternal aunt Maria, who also received similar results from ancestry.com.

7. On page 42, in the first full paragraph, in the explanatory phrase to the citation *In re T.G.* (2020) 58 Cal.App.5th 275, 294, delete the open parenthesis before the quote and replace with an open bracket.

8. On page 42, in the first full paragraph, in the sentence beginning with "Without the identity," delete the phrase "Bureau of Indian Affairs," the parentheses around "BIA," and the hyphen between the words "federally" and "recognized," so that the sentence reads:

> Without the identity of a tribe, let alone a federally recognized one, or at least a specific geographic area of possible ancestry origin, the BIA could not have assisted the Department in identifying the tribal agent for any relevant federally recognized tribes.

9. On page 44 replace asterisk footnote following "Dillon, J." with a single dagger/obelisk footnote.

The opinion in this case filed March 2, 2021 was not certified for publication. Because the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), respondent's request for publication under California Rules of Court, rule 8.1120(a), is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be partially published in the Official Reports.

This order does not change the appellate judgment.

---

SEGAL, Acting P. J.          FEUER, J.          DILLON, J.†

---

† Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

4